## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

_____ )
**FRANCISCO JAVIER AVILA BERNAL**            )
**and**                                      )
**PEDRO LUIS AVILA BERNAL,**                 )
                                             )
      **Plaintiffs,**                    )
                                             )
**vs.**                                      ) **Civil Action No.** <u>1:18-cv-88-</u>GNS
                                             )
**MIKE COLEMAN**                             )
**and**                                      )
**KIMBERLY COLEMAN,**                        )
                                             )
      **Defendants.**                    )
_____ )

## COMPLAINT

### PRELIMINARY STATEMENT

1.    Plaintiffs Francisco Javier Avila Bernal ("Francisco") and Pedro Luis Avila Bernal ("Pedro") (jointly, "Plaintiffs" or the "Avila Bernals") are two Mexican Hispanic workers who were forced to work under abusive conditions by threats and coercion and were subjected to a severe hostile work environment because of their race and national origin, including verbal and physical assaults, carried out by their supervisor, Defendant Kimberly Coleman ("Kim"), while they were employed at her and her husband's farm in Adairville, Kentucky in 2016.

2.    The Avila Bernals, who are brothers, were brought to the United States by Defendant Mike Coleman ("Mike") under the federal H-2A visa program to perform agricultural work planting and harvesting tobacco in 2016.

3.    Kim, who is Mike's wife, acted as the supervisor of the Avila Bernals as well as ten other H-2A workers and at least one U.S. citizen farmworker.

4.      In her capacity as a field supervisor, Kim subjected the H-2A workers, including the Avila Bernals, to constant verbal and physical abuse throughout the workday. She threatened to have them blacklisted from returning to the United States on a legal visa if they complained about their treatment to government agencies charged with investigating employment law violations. Kim also hit the workers, including the Avila Bernals, with wooden tobacco sticks on their legs and buttocks as they worked, while yelling racially-charged epithets, including "stupid Mexicans," "worthless Mexicans," and "Mexicans full of shit."

5.      Kim especially targeted Francisco due to a limp he had incurred from an accident years prior. Although the limp did not affect his ability to work, Kim frequently mocked him by walking with a limp behind him, pushing him, and calling him worthless and disabled.

6.      On September 9, 2016, days before the 50%-point of the H-2A contract, at which point Mike, pursuant to the H-2A regulations, would have had to reimburse Francisco for costs he expended to get to the farm, Kim fired Francisco without cause and ordered him to leave the farm. She had him sign a paper in English that he did not understand that falsely stated that he was leaving voluntarily.

7.       Unable to endure the humiliation and mistreatment any longer, Pedro felt forced to leave the farm with his brother. As she did with Francisco, Kim made Pedro sign a document in English that he did not understand.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 42 U.S.C. § 1981 (race discrimination), 29 U.S.C. § 216(b) (Fair Labor Standards Act ("FLSA")), 18 U.S.C. § 1595(a) (Trafficking Victims Protection Act ("TVPA")), and 28 U.S.C. § 1331 (subject matter jurisdiction). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332

2

(diversity jurisdiction), as damages exceed $75,000 per plaintiff.

9.     This Court has supplemental jurisdiction over the Avila Bernals' state law causes of action, including claims under the Kentucky Civil Rights Act, K.R.S. § 344.040(1) (race and national origin discrimination), breach of contract, and Francisco's claim of intentional infliction of emotional distress, pursuant to 28 U.S.C. § 1367(a), as these claims arise out of the same nucleus of facts that support the federal claims.

10.    This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

12.    Defendant Mike Coleman is a natural person residing in Adairville, Logan County, Kentucky. On information and belief, Mike operates as a sole proprietorship with his principal place of business in Logan County, Kentucky.

13.    Mike owns or operates tobacco fields and sheds in Logan County, Kentucky.

14.    In 2016, Mike was the Avila Bernals' employer within the meaning of the FLSA, 29 U.S.C. § 203(d), the H-2A regulations, 20 C.F.R. § 655.103(b), the Kentucky Civil Rights Act § 344.030(b), and OSHA's Agricultural Worker Protection Standard ("WPS"), 40 C.F.R. Part 170.

15.    Defendant Kim Coleman is a natural person residing in Adairville, Logan County, Kentucky. Kim is married to Mike.

16.    In 2016, Kim was the Avila Bernals' supervisor and employer within the meaning of the FLSA, 29 U.S.C. § 203(g), the H-2A regulations, 20 C.F.R. § 655.103(b) and OSHA's WPS, 40 C.F.R. Part 170. As the Avila Bernals' supervisor, Kim was Mike's agent within the

3

meaning of the Kentucky Civil Rights Act § 344.030(b).

17.     The Avila Bernals are Hispanic citizens of Mexico who were admitted to the United States on a temporary basis pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a) to perform agricultural labor for Mike beginning in or around July of 2016. The Avila Bernals in 2016 received H-2A visas pursuant to this statutory provision and were employed by Mike and Kim under these visas.

18.     Plaintiff Francisco Avila Bernal is a resident of Mexico. He performed agricultural labor for Mike and Kim in Kentucky from on or about July 9, 2016 to on or about September 9, 2016, when he was unlawfully fired.

19.      Plaintiff Pedro Avila Bernal is a resident of Mexico. He performed agricultural labor for Mike and Kim in Kentucky from on or about July 17, 2016 until on or about September 9, 2016.

20.     While working for Defendants in 2016, the Avila Bernals were employed by Defendants within the meaning of the FLSA, 29 U.S.C. § 203(g).

21.     At all times relevant to this action, Francisco and Pedro were each "employee[s]" of Defendants within the meaning of the FLSA, 29 U.S.C. § 203(e).

22.     At all times relevant to this action, Francisco and Pedro were each "employee[s]" and "H-2A worker[s]" of Defendants within the meaning of 20 C.F.R. § 655.103(b).

### FACTS

### Mike Coleman's Participation in the Federal H-2A Visa Program

23.     An agricultural employer in the United States may import aliens to perform labor of a temporary nature if the U.S. Department of Labor ("DOL") certifies that: (1) there are insufficient available workers within the United States to perform the job; and (2) the

4

employment of aliens will not adversely affect the wages and working conditions of similarly situated U.S. workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188(a)(1). Aliens admitted in this fashion are commonly referred to as "H-2A workers."

24.     Agricultural employers seeking the admission of H-2A workers must first file a temporary employment certification application with DOL. 20 C.F.R. § 655.130.

25.     This application must include a job offer, commonly referred to as a "clearance order" or "job order," complying with applicable regulations, which is used in the recruitment of both U.S. and H-2A workers. 20 C.F.R. § 655.121(a)–(c). The H-2A regulations establish the minimum benefits, wages, and working conditions that must be offered in order to avoid adversely affecting U.S. workers. 20 C.F.R. §§ 655.0(a)(2), 655.122, 655.135.

26.     Alleging a lack of available, documented agricultural workers in the area of its operations, Mike filed two applications to employ temporary foreign workers through the H-2A program during the 2016 tobacco season.

27.     Mike's initial temporary labor certification application for the 2016 season sought admission of two workers for employment from March 1, 2016 to December 31, 2016 and was anticipated to provide workers with an average of 40 hours of work per week.

28.     Mike later submitted a second temporary labor certification application for the 2016 season seeking admission of ten additional workers for employment from June 13, 2016 to December 31, 2016. This labor certification application also anticipated providing workers with an average of 40 hours of work per week.

29.     As part of his temporary labor certification applications described in paragraphs 23–28, Mike included job offers purporting to comply with applicable H-2A regulations, which were used in the recruitment of both U.S. and H–2A workers. 20 C.F.R. § 655.121(a)–(c).

5

30.     The clearance orders submitted to DOL by Mike contained a certification that the clearance orders encompassed all material terms and conditions of the job and described the actual terms and conditions of employment being offered, as required by 20 C.F.R. § 653.501(d)(3).

31.     Mike's temporary labor certification applications, as described in paragraphs 23–30, explicitly and implicitly incorporated DOL regulations at 20 C.F.R. § 655 Subpart B. DOL accepted Defendant Mike's clearance orders filed with respect to the 2016 tobacco season as described in paragraphs 23–30. Mike was eventually granted permission by DOL to begin the visa process of importing foreign laborers.

32.     The U.S. Customs and Immigration Services of the Department of Homeland Security ultimately issued H-2A visas to fill the manpower needs described in Mike's clearance orders.

33.     The Avila Bernals received H-2A visas under, and Mike hired them to work under, the later clearance order, scheduled to start on June 13, 2016. A true and correct copy of this clearance order is attached hereto as Exhibit 1.

34.     The later clearance order, which is attached as Exhibit 1 hereto, constituted the work contract between the Avila Bernals and Mike.

35.     The terms of work offered to the Avila Bernals in the 2016 season included, among other things:

      a.   the terms offered in the clearance order described in paragraph 30;

      b.   the contents required by law to be contained in all H-2A job offers as set forth in the regulations governing the Avila Bernals' visas, 20 C.F.R. § 655.122; and

c.   the legally required assurances and obligations of H-2A employers as set forth in 20 C.F.R. § 655.135.

36.   Specifically, the Avila Bernals' work contracts offered, among other things, the following terms:

a.   A reimbursement, at the 50%-point of the contract's term, to the Avila Bernals for reasonable costs incurred by the Avila Bernals for transportation and daily subsistence from Avila Bernals' homes in Mexico to Defendants' farm in Adairville, Kentucky;

b.   Wages equal to the highest of the adverse effect wage rate ("AEWR"), which was $10.85 per hour in Kentucky during the 2016 tobacco season, the prevailing hourly wage rate, or the FLSA minimum wage rate;

c.   A guaranteed minimum amount of work or wages for 3/4 of the period running from the first workday to the end date specified in the clearance order;

d.   Compliance with all applicable Federal, State, and local laws and regulations, including health and safety laws such as OSHA's WPS, 40 C.F.R. Part 170. 20 C.F.R. § 655.135(e);

e.   Termination of workers only for just cause; and

f.   Provision or payment for Plaintiffs' transportation and daily subsistence from Defendants' farm to Plaintiffs' homes in Mexico at the end of the contract or if Plaintiffs were terminated without cause, 20 C.F.R. § 655.122(h)(2).

37.   The Avila Bernals' work contracts did not allow for payment on a piece rate or for pay to be calculated on a group rate. Rather, the only wage rate listed and permitted was a

rate of $10.85 per hour for all tasks included in the contracts.

## The Avila Bernals' Arrival at the Coleman Farm

38.     In or around July 2016, the Avila Bernals traveled at their own expense from their homes in Ahuacatlán, Nayarit to Monterrey, Nuevo Leon for their H-2A visa interviews at the U.S. Consulate, and then on to Kentucky.

39.     To reach the Coleman farm, the Avila Bernals were required to pay various fees and expenses, including but not limited to visa fees and transportation expenses from their hometowns in Ahuacatlán.

40.     In order to secure employment at the Coleman farm, the Avila Bernals had to take out loans in order to pay for the fees and expenses related to their H-2A visas and travel to Kentucky. Each of the Avila Bernals took out loans in the amount of around 11,500 pesos (approximately US $600) each.

41.     But for the Avila Bernals' employment with Defendants, they would not have incurred the expenses, other than daily subsistence, described in paragraph 40.

42.     The expenses, other than daily subsistence, incurred by the Avila Bernals described in paragraph 40 were necessary to their employment with Defendants.

43.     The expenses, other than daily subsistence, incurred by the Avila Bernals described in paragraph 40 primarily benefitted Defendants.

44.     Francisco traveled to Kentucky earlier than his brother and arrived at Defendants' farm on or about July 9, 2016. He had never worked on an H-2A visa before, and 2016 was his first season at Defendants' farm.

45.     Pedro arrived on an H-2A visa about one week later, on or around July 17, 2016. Pedro had worked for the Colemans in previous seasons, starting in 2013.

46.     During the Avila Bernals' first work week, Kim gave the workers, including the Avila Bernals, some cash as reimbursement for their H-2A visa and travel related costs. The cash did not fully reimburse the Avila Bernals for the expenses, other than daily subsistence, described in paragraph 40.

47.     The expenses described in paragraph 40 functioned as de facto deductions from the Avila Bernals' wages during their first workweek with Defendants in 2016.

48.     The deductions described in paragraph 40 caused the Avila Bernals to earn less than the AEWR and the federally mandated minimum wage during their first workweek with Defendants in 2016.

49.     In previous years, Pedro and other workers had brought to Kim's attention that the inbound reimbursements she gave them did not cover their actual H-2A visa and travel related costs. Neither Mike nor Kim asked the Avila Bernals about their inbound expenses to calculate the workers' actual costs or to ensure that the reimbursements were sufficient to cover their actual expenses.

50.     Upon arrival, the Avila Bernals had to purchase gloves and masks for work, which were not provided by the Colemans.

### The Avila Bernals' Employment at the Coleman Farm

51.     While working for Defendants in 2016, the Avila Bernals were engaged in the production of goods, including tobacco, for commerce as that phrase is used in the FLSA.

52.     While working for Defendants in 2016, the Avila Bernals worked on tobacco that moved in interstate commerce.

53.     While working for Defendants in 2016, the Avila Bernals handled materials, including tobacco and tools, that moved in interstate commerce.

54.     On information and belief, in 2016 Defendants had at least $500,000 in gross volume of sales made or business done.

55.     Although Mike petitioned for and employed the H-2A workers, in every season that Pedro worked for the Colemans, including 2016, Kim worked as the field supervisor, overseeing the workers' labor in the fields. The workers referred to her as "patrona," or "boss."

56.     Kim was in charge of assigning jobs to each worker each day, giving them breaks, and monitoring the quality of their work and the speed with which they performed their jobs.

57.     Kim was also in charge of keeping track of the hours worked by each worker, calculating their pay, and paying them in cash on payday. At the beginning of each season, the workers were given worksheets on which to record their hours. They turned these worksheets in to Kim.

58.     Sometimes Kim changed the hours the workers wrote down on their worksheets, reducing the hours by small increments.

59.     Kim had the power to fire workers.

60.     The Avila Bernals knew of at least one worker Kim had fired for not working fast enough.

61.     In addition to the 12 H-2A workers employed by the Colemans during the 2016 season, the Colemans employed at least one U.S. citizen farmworker named Tracy, a White woman.

62.     When the Avila Bernals arrived in July of 2016, they arrived at the farm in time for what is known as the "topping" or deflowering portion of the season.

63.     During this portion of the season, the Colemans had the H-2A workers working in fields that were being sprayed by pesticides, in violation of OSHA's WPS, 40 C.F.R. Part 170,

and their work contracts.

64.     Under OSHA's WPS, 40 C.F.R. Part 170, as applicable in 2016, agricultural employers were prohibited from allowing or directing any person, other than an appropriately trained and equipped handler, to enter or remain in any area being treated with pesticides. 40 C.F.R. § 170.110(a).

65.     In 2016, OSHA's WPS prohibited agricultural employers from allowing or directing workers to enter or remain in any treated areas before the restricted-entry interval specified on the pesticide labeling had expired. 40 C.F.R. § 170.112(a). A worker could enter such areas only if the agricultural employer assured that, among other things, no hand labor activity would be performed; the time in treated areas was restricted to one hour in a 24-hour period; and personal protective equipment such as chemical-resistant suits and/or gloves, respiratory protection devices, chemical-resistant headgear, and protective eyewear were provided to the worker. 40 C.F.R. § 170.112(c).

66.     OSHA's WPS also mandated that agricultural employers inform their workers of the dangers of the pesticides being used, in a manner the worker could understand, including the location and description of the treated area, the time during which entry was restricted, and instructions not to enter the treated area until the restricted-entry interval had expired. 40 C.F.R. § 170.120(d)(1)-(3).

67.     OSHA's WPS required agricultural employers to assure that any worker entering a recently treated area had been trained before his sixth day of entry into the area. 40 C.F.R. § 170.130(a)(3)(ii). The training was required to cover general pesticide safety information in a manner the workers could understand, using nontechnical terms. 40 C.F.R. § 170.130(d).

68.     All of the above standards were incorporated implicitly or explicitly in the

workers' contracts.

69.     In violation of OSHA's WPS and the workers' contracts, the Colemans directed the Avila Bernals and their co-workers to work in areas that were being sprayed with pesticides.

70.     The pesticides were sprayed over the fields and fell onto the backs of the workers as they worked.

71.     Prior to sending the workers into the fields where the pesticides were being sprayed, the Colemans provided no training or instructions about pesticide safety, as required under the workers' contract and 40 C.F.R. § 170.130.

72.     Prior to sending the workers into the fields where the pesticides were being sprayed, the Colemans provided no protective gear for the workers, in violation of the workers' contract and 40 C.F.R. §§ 170.112.

73.      About two weeks into his contract with the Colemans, Francisco received severe burns on his back from the pesticides. Kim saw the burns on his back when she came to the worker housing and saw him with his shirt off. She asked what had happened and another worker told her in English that Francisco had been burned by the pesticides. Kim responded that Francisco should be more careful, and made no offer to provide medical assistance or treatment for his burns.

74.     At some point during the 2016 season, a group of the H-2A workers, including Pedro, confronted Kim about the pesticide problem and the lack of protective gear. Kim responded that it was not her problem and that they should stop complaining or should buy something to protect themselves.

75.     After deflowering, the H-2A workers moved on to the "cutting" part of the season, where they cut the tobacco stalks and impaled them with a "tobacco stick," a stake

measuring about 48 to 50 inches long and one inch thick. Once filled, a stalked tobacco stick weighs up to 50 or 60 pounds.

76.     Finally, the workers were tasked with loading and hanging the tobacco. For loading, the workers loaded the stalked tobacco sticks in piles onto tractor-pulled trailers driven by Kim or Tracy. The workers then transferred the stalked tobacco sticks to a barn containing rows of wooden beams stacked in tiers to the ceiling. Workers on the ground unloaded the stalked tobacco sticks from the trailer and passed them to "shakers," workers who stand on top of the beams either to hang the tobacco or pass it on to another shaker on a higher beam.

77.     In every year that Pedro worked at the Colemans' farm, Kim yelled at the H-2A workers in the fields as they worked. Often she yelled at the H-2A workers to work faster and threatened to reduce their pay or change them to piece rates if they did not keep up with her demands.

78.     Not only did Kim not limit her outbursts to demands that the H-2A workers work faster, but she also on a regular basis spewed racially-charged insults at them such as "full of shit Mexicans," "worthless Mexicans," and "stupid Mexicans," as well as other curse words like "motherfuckers," "assholes," and "sons of bitches."

79.     Kim frequently threatened to not pay the H-2A workers what they were owed, to reduce their hourly rate, or to fire them if they did not acquiesce to her demands.

80.     Occasionally some of the H-2A workers, including Pedro, asked her not to yell, or raised concerns about their working conditions. In response, Kim threatened to send the H-2A workers back to Mexico if they complained. She also told the workers that she had the power to have them blocked from ever returning to the United States on a visa again, by calling "immigration" or the U.S. Consulate in Mexico to have them blacklisted.

81.     On one occasion during the 2016 season, Kim informed the workers that an "association" was coming to inspect the farm. The Avila Bernals understood that the "association" was a U.S. agency that monitored farmers to make sure that they were complying with employment laws. In advance of this visit, Kim instructed the workers to tell the "association" that everything was fine, that there were no problems, and that she was a great boss. She again threatened to have them sent home to Mexico, barred at the consulate, or to not give them work for a week if they told the "association" anything different. Kim even paid the crewleader, another H-2A worker named Ernesto, to lie to investigators and to make sure the other workers lied as well.

82.     In addition to the race-based verbal abuse, Kim frequently hit the H-2A workers with tobacco sticks as they worked, especially when she became angry, which was often.

83.     Most of the hitting occurred during the hanging portion of the season, when the H-2A workers were standing on the beams to hang the 50-60 pound tobacco leaves. To hang the tobacco leaves, workers would have to straddle two beams and balance themselves as they lifted and hung the leaves to dry.

84.     Kim would stand on the ground below the H-2A workers and hit them, including Pedro, with a tobacco stick around their feet, ankles, and buttocks as they were attempting to hang the tobacco. As she did so, she would yell at them to work faster, saying, "Arriba, arriba!" and call them worthless or stupid Mexicans. The H-2A workers standing on the beams would have to grab the hanging tobacco leaves to keep from falling as she hit them.

85.     Standing on the beams without any protective gear to catch them if they fell was already dangerous, but it was made more so by Kim hitting the workers' legs and buttocks. Indeed, in a previous season, Pedro fell from the beams he was standing on after Kim hit him in

14

the buttocks, from a height of about six to eight feet.

86.     Kim also hit the H-2A workers who were on the ground passing the tobacco up, including Francisco, with tobacco sticks. Lifting the tobacco leaves up to the workers on the beams is strenuous and taxing, and Kim's hitting interfered with Francisco's ability to concentrate on his work.

87.     In addition to hitting their legs and ankles, Kim jabbed the tobacco sticks into the H-2A workers' buttocks, including the Avila Bernals', as they worked, singing a song as she did so. The song included phrases along the lines of: "Full of shit Mexicans, I'll stick you in the ass."

88.     Kim terrorized the H-2A workers, including the Avila Bernals, in other ways. On one occasion during the 2016 season, Kim grew angry at the H-2A workers over a dispute about wages. She had threatened to lower wages, and the workers protested. Kim got into her truck and then drove straight at the H-2A workers, causing them to run for cover into the tobacco fields, where they knew she wouldn't chase them so as not to damage the crop. As she did so, she was yelling that the workers were worthless and that she was going to send them all home to Mexico.

89.     While neither Pedro nor Francisco was present at the time Kim drove at the workers—they were in the worker housing, sick—they heard the story from their returning co-workers and felt afraid of Kim and what she might do.

90.     By contrast, Kim never yelled, made derogatory remarks to, or physically assaulted Tracy, the White worker who assisted Kim on the farm.

91.     During the 2016 season, the H-2A workers, including the Avila Bernals, also told Mike, who they knew was the owner of the farm, about Kim's mistreatment of them. Kim later came to the worker housing, yelling at the H-2A workers for having involved Mike.

92.     Despite the workers having told Mike of the abuse, Kim continued to abuse them,

and Mike took no action to end her abuse.

## Kim Targeted Francisco Especially

93.     While Kim verbally and physically mistreated all of the H-2A workers, she singled out Francisco for particular abuse.

94.     Francisco had been hit by a car in his youth, leaving him with a limp. Although this limp did not interfere with his ability to perform his work, Kim used it as an excuse to mock and belittle him. While he worked, she would walk behind him, limping dramatically and squinting her eyes, saying things such as, "Look, look, everybody, look at how he walks!" and calling him a "worthless, good-for-nothing Mexican."

95.     Francisco does not speak much English and asked a co-worker to translate what Kim was saying about him. He then asked the same co-worker to ask Kim not to mock him, but she continued to do so.

96.     In addition to the mocking, Kim would physically push Francisco while he worked, all while berating and insulting him. Kim would stand beside him as he worked, jab him with a tobacco stick, and yell curse words and denigrating remarks at him. If he turned his head towards her, she would yell, "Work faster or I'll send you back to Mexico!" or would call him a worthless Mexican.

97.     At one point during the 2016 season, Pedro asked Kim why she insisted on mocking his brother and requested that she treat him with respect. But Kim continued to abuse Francisco.

98.      The constant mocking of his limp and the racially-charged disparagement and physical assaults traumatized Francisco and affected his ability to concentrate at work. He felt anxious and physically afraid that she would hit him, as he tried to do his work. Francisco came

to dread going to work, and he feared what Kim would do to him each day.

99.     Many nights, Francisco would return to the worker housing despondent over Kim's offensive treatment and wanting to go home to Mexico, but his debt and Kim's threats that she would have him barred from entering the United States again prevented him from leaving. He felt as though he must endure the abusive conditions in order to repay the debts he had accrued to get to the Colemans' farm and to avoid being blacklisted. Given her abuse of him at work, he was also afraid that if he left, she would find him and hurt him. Having to endure her abuse made him feel powerless, humiliated, and anxious.

100.    Pedro likewise continued to labor in the abusive conditions because of Kim's threats. Pedro had endured the racial epithets and physical abuse for the three prior years that he worked on the Coleman farm, putting up with it because he did not want to be blacklisted from future employment, as Kim had threatened. He believed Kim when she said she could have him barred from returning to the United States if he crossed her. Losing his ability to legally work in the United States would have caused him serious financial harm.

### Kim's Termination of the Avila Bernals

101.     On or around September 8, 2016, just days before the 50%-mark of the contract when full reimbursement for his travel costs would become due, Francisco and a co-worker fell ill with nausea, vomiting, and diarrhea, which may have been due to nicotine poisoning that can occur from exposure and handling wet tobacco leaves. Due to their sickness, Francisco and the co-worker stayed home from work for part of the day.

102.    The following morning, both Francisco and his co-worker were feeling better and were ready to go back to work.

103.    That morning, Kim called the worker housing to assign the workers their duties

for the day but declined to give Francisco any work. When the crewleader, Ernesto, asked about Francisco, Kim said she was sending Francisco home to Mexico.

104.   Pedro and the crewleader then went to Kim to ask why she was firing Francisco.

105.   In response, Kim called Francisco disabled and worthless and added something along the lines of: "He can go fuck himself in Mexico."

106.   When Pedro attempted to stand up for his brother, Kim began to yell at Pedro, saying that he could accompany his brother to Mexico. Ultimately, Pedro felt he could no longer tolerate her offensive abuse and harassment and felt compelled to leave too.

107.   Kim gave Francisco and Pedro a paper in English and told them to sign it. The Avila Bernals did not know what it said or why they were signing it.

108.   The Colemans did not pay for the Avila Bernals' travel back to Mexico.

109.   During the course of the Avila Bernals' employment in 2016, Defendants failed to comply with material terms and conditions of employment offered to the Avila Bernals in the clearance order submitted to the DOL and in the H-2A regulations governing the Avila Bernals' contracts at 20 C.F.R. § 655.122 and 20 C.F.R. § 655.135.

110.   During the course of the Avila Bernals' employment, Defendants:

a.   Failed to fully reimburse the Avila Bernals for their H-2A-related and travel expenses, 22 C.F.R. § 655.122(h)(1) and (2);

b.   Failed to reimburse the Avila Bernals at the 50%-point of the contract's term for reasonable costs incurred by them for transportation and daily subsistence from Plaintiffs' homes in Mexico to Defendants' farm in Adairville, Kentucky;

18

c.  Failed to pay Plaintiffs wages equal to the higher of the AEWR, the prevailing hourly wage rate, or the FLSA minimum wage rate, in compensation for all of Plaintiffs' hours worked;

d.  Failed to provide Plaintiffs with work or wages for 3/4 of the period running from the first workday to the end date specified in the clearance order;

e.  Failed to comply with applicable Federal, health and safety laws, 20 C.F.R. § 655.135(e), specifically the OSHA WPS, 40 C.F.R. Part 170, by making Plaintiffs work while pesticides were being sprayed over them, failing to provide sufficient protective gear, and failing to provide pesticide safety training;

f.  Terminated Francisco without just cause; and

g.  Failed to provide for or pay Plaintiffs' transportation and daily subsistence from Defendants' farm to Plaintiffs' homes in Mexico, 20. C.F.R. § 655.122(h)(2).

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866
42 U.S.C. § 1981

### *The Avila Bernals Against Defendants Mike and Kim Coleman*

111.  The Avila Bernals re-allege and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

112.  The Avila Bernals assert this claim pursuant to 42 U.S.C. § 1981 against Defendants Mike and Kim Coleman.

113.  The actions of Kim, as set forth herein, violated the Avila Bernals' rights to

19

receive full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, including the Avila

Bernals' rights to enjoy and benefit from non-discriminatory employment relationships with their

employers.

114.    The Avila Bernals are ethnically Hispanic, and as such are members of a

protected class pursuant to 42 U.S.C. § 1981.

115.    Kim terrorized the Avila Bernals and their co-workers by yelling insults at them

based on their Hispanic ethnicity throughout the day as they worked, constantly threatening to

send them back to Mexico or to have them blacklisted if they did not do what she demanded, and

physically hitting and jabbing them with tobacco sticks around their legs and their buttocks while

shouting and singing racial slurs.

116.     Through these actions and those described in the preceding paragraphs, Kim

created an objectively hostile and abusive work environment on account of the Avila Bernals'

race and ethnicity.

117.    Kim's discrimination and harassment of Francisco based on what she perceived to

be his disability further terrorized him and made his working environment unbearable.

118.    As set forth in the preceding paragraphs, Kim's discriminatory and offensive

treatment of the Avila Bernals was sufficiently severe that it created a hostile work environment

in violation of 42 U.S.C. § 1981.

119.    The Avila Bernals reasonably perceived their work environment to be hostile,

abusive, and discriminatory on the basis of their race and ethnicity.

120.    Kim's hostile, abusive, and discriminatory treatment of the Avila Bernals was

unwelcome.

121.    Kim treated the Avila Bernals differently from and worse than how she treated the

20

farm's White employee.

122.    Kim knowingly, willfully, maliciously, intentionally, and without justification acted to deprive the Avila Bernals of their rights.

123.    Kim was the Avila Bernals' supervisor, with the power to take tangible employment actions against them, including, among other things, the power to fire workers.

124.    Mike, the Avila Bernals' employer, failed to take sufficient steps to remedy the harassing and discriminatory treatment to which the Avila Bernals were subjected. The Avila Bernals and their co-workers made Mike aware of Kim's harassing and discriminatory treatment and asked him to intervene, but he failed to remedy the abuse.

125.    As a result of Kim's unlawful acts and Mike's failure to remedy the discrimination and harassment, the Avila Bernals have suffered loss of income, distress, humiliation, embarrassment, emotional pain, and other damages.

126.    The Avila Bernals seek all appropriate relief in an amount to be determined at trial, including:

    a.  compensatory damages for the deprivation of the Avila Bernals' civil rights;

    b.  compensatory damages for emotional pain and suffering, including distress, fright, nervousness, grief, anxiety, depression, worry, mortification, shock, humiliation, indignity, embarrassment, panic, apprehension, or ordeal experienced as a result of the deprivation of the Avila Bernals' civil rights;

    c.  punitive damages for the malicious and reckless discriminatory conduct of Mike and Kim; and

    d.  attorney's fees and costs of this action as set forth in 42 U.S.C. § 1988(b)-(c).

## SECOND CLAIM FOR RELIEF

FAIR LABOR STANDARDS ACT

### *The Avila Bernals Against Defendants Mike and Kim Coleman*

127.    The Avila Bernals re-allege and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

128.    The Avila Bernals assert this claim for damages against Defendants Mike and Kim Coleman pursuant to the FLSA, 29 U.S.C. § 201 *et seq.*

129.    Mike and Kim violated 29 U.S.C. § 206 by failing to pay the Avila Bernals the applicable minimum wage of $7.25 per hour for every compensable hour of labor the Avila Bernals performed in their respective first workweeks.

130.    The violations of the FLSA minimum wage requirement set forth in the preceding paragraph resulted from Mike and Kim's unlawful de facto deductions from the Avila Bernals' first workweek wages arising out of Mike and Kim's failure to reimburse the Avila Bernals for the full amount of their inbound costs.

131.    As a consequence of Mike and Kim's violation of the FLSA, the Avila Bernals are entitled to recover the following damages, including:

      a.   reimbursement of the Avila Bernals' unpaid minimum wages;

      b.   an additional equal amount in liquidated damages; and

      c.   costs of suit, and reasonable attorney's fees pursuant to 29 U.S.C. § 216(b).

### **THIRD CLAIM FOR RELIEF**

BREACH OF CONTRACT

### *The Avila Bernals Against Defendants Mike and Kim Coleman*

132.    The Avila Bernals re-allege and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

133.    The Avila Bernals performed all material contractual obligations of employment that they were called upon to perform under their employment contract.

134.    Defendants' breaches of the Avila Bernals' employment contracts caused the Avila Bernals substantial injuries, including pecuniary harm, mental anguish and emotional distress by virtue of the pesticide and nicotine exposure.

135.    Defendants failed to perform their obligations under their employment contract with each Plaintiff and materially breached their contractual obligations owed to each Plaintiff during the course of the 2016 season, as set forth in paragraph 110 above.

### FOURTH CLAIM FOR RELIEF

KENTUCKY CIVIL RIGHTS ACT
(KENTUCKY REVISED STATUTES, § 344.040)

#### *The Avila Bernals Against Defendant Mike Coleman*

136.    The Avila Bernals re-allege and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

137.    The Avila Bernals assert this claim for damages against Defendant Mike Coleman pursuant to K.R.S. § 344.450.

138.    The Avila Bernals are Mexican citizens and ethnically Hispanic, and as such are a protected class under K.R.S. § 344.040, which prohibits discrimination based on race and national origin in the terms and conditions of employment.

139.    In 2016, Mike was an "[e]mployer" within the meaning of K.R.S. § 344.030(2) because he employed more than eight "[e]mployees," as defined by K.R.S. § 344.030(5)(1), within the state of Kentucky for 20 or more calendar weeks in 2016.

140.    In her capacity as Plaintiffs' supervisor, Kim was Mike's agent within the meaning of K.R.S. § 344.030(2), and Mike's knowledge is considered to be the same as Kim's

such that Mike is vicariously liable for all her actions and omissions as if undertaken by Mike himself.

141.    The actions and omissions described herein constituted discrimination against Plaintiffs on account of their race and national origin, including the creation of a hostile working environment.

142.    Kim knowingly, willfully, maliciously, intentionally, and without justification acted to deprive the Avila Bernals of their rights.

143.    As a direct and proximate result of the race- and national-origin-based animus of Kim, the Avila Bernals suffered substantial injuries and damages, including humiliation, embarrassment, and lost past and future wages.

144.    The Avila Bernals seek all appropriate relief in an amount to be determined at trial, including:

   a.  compensatory damages for the deprivation of their civil rights;

   b.  compensatory damages for lost and future wages through the end of their H-2A employment contracts;

   c.  compensatory damages for emotional pain and suffering, including distress, fright, nervousness, grief, anxiety, depression, worry, mortification, shock, humiliation, indignity, embarrassment, panic, apprehension, or ordeal experienced as a result of the deprivation of the Avila Bernals' civil rights; and

   d.  attorney's fees and costs of this action as set forth in K.R.S. § 344.450.

### FIFTH CLAIM FOR RELIEF

OUTRAGEOUS CONDUCT/ INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS

### *Plaintiff Francisco Avila Bernal Against Defendant Kim Coleman*

145.    The Avila Bernals re-allege and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

146.    Francisco brings this claim of outrageous conduct under Kentucky state law against Kim.

147.    Kim intentionally caused Francisco severe emotional distress when she repeatedly mocked him for what she perceived to be a disability— namely, his limp. Kim followed Francisco while he was trying to work, limping in an exaggerated manner and laughing while she made fun of him or called him names such as worthless and disabled. If Francisco looked at her while she did this, she yelled at him to keep working and threatened to fire him or send him back to Mexico.

148.    Kim's relentless mockery of someone she perceived to be disabled offends against the generally accepted standards of decency and morality.

149.    Kim's unrelenting torment of Francisco directly caused him to suffer extreme emotional distress; it interfered with his ability to concentrate at work; and it made him feel powerless, humiliated, and anxious. Moreover, Francisco was in fact powerless to stop her, as she constantly held the threats of firing him, blacklisting him, and having him sent back to Mexico over his head.

150.    As a direct and proximate result of Kim's torment, Francisco suffered substantial injuries and damages, including humiliation, anxiety, indignity, panic, embarrassment, and depression.

151.    Francisco seeks all appropriate relief in an amount to be determined at trial, including: compensatory damages for emotional pain and suffering, including distress, fright,

nervousness, grief, anxiety, depression, worry, mortification, shock, humiliation, indignity, embarrassment, panic, apprehension, or ordeal experienced as a result of Kim's outrageous conduct.

### SIXTH CLAIM FOR RELIEF

THE TRAFFICKING VICTIMS PROTECTION ACT (TVPA)
Forced Labor (18 U.S.C. § 1589)

*The Avila Bernals Against Defendants Mike and Kim Coleman*

152.    The Avila Bernals re-allege and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

153.    The Avila Bernals bring this claim against Defendants Mike and Kim Coleman.

154.    The Avila Bernals are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the TVPA, 18 U.S.C. § 1595.

155.    Kim attempted to and did subject the Avila Bernals to forced labor in violation of 18 U.S.C. § 1589.

156.    Kim knowingly attempted to and did threaten the Avila Bernals with physical harm in order to obtain the labor and services of the Avila Bernals, in violation of 18 U.S.C. § 1589(a)(1).

157.    Kim knowingly attempted to and did threaten the Avila Bernals with serious harm in order to obtain the labor and services of the Avila Bernals, in violation of 18 U.S.C. § 1589(a)(2).

158.    Kim knowingly attempted to and did obtain the labor and services of the Avila Bernals using a scheme, plan, or pattern that, in the totality of the circumstances, was intended to coerce and did coerce the Avila Bernals to believe that they would suffer serious harm if they were to leave the employ of the Colemans, in violation of 18 U.S.C. § 1589(a)(4).

159.    Kim's scheme to use psychological and physical harm, including unlawful discrimination in violation of 42 U.S.C. § 1981 and Kentucky state law, and threats of immigration consequences and of physical harm, was designed to convince the Avila Bernals that they would suffer serious harm if they were to leave the Colemans' employ and to falsely imprison them at the farm.

160.    Kim threatened the Avila Bernals with being prohibited from returning to the United States on a work visa, and she coerced them into remaining silent about the abusive work conditions when interviewed by investigators, in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(a)(3).

161.    As owner and employer of the farm, Mike knowingly benefitted financially from participation in a venture with his wife that he knew or should have known was engaged in the acts set forth in paragraphs 155-160, in violation of 18 U.S.C. § 1589(b). Mike was made explicitly aware of his wife's abuse of the workers when the workers told him what she was doing, yet he did nothing to stop her and continued to use the workers' labor to profit in his tobacco business.

162.    As a proximate result of the conduct of the Defendants, the Avila Bernals have suffered emotional injuries and other damages.

163.    Under the TVPA, the Avila Bernals are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including:

        a.    damages for emotional pain and suffering, including nervousness, grief, anxiety, depression, worry, mortification, shock, humiliation, indignity, embarrassment, panic, apprehension, or ordeal experienced;

        b.    punitive damages; and

c.  attorney's and expert fees, and costs as authorized by 18 U.S.C. § 1595.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter an order:

(a)     Declaring that Defendants, by the acts and omissions described above, violated Plaintiffs' rights to receive full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981 as set forth in Plaintiffs' First Cause of Action;

(b)     Granting judgment in favor of Plaintiffs on their 42 U.S.C. § 1981 discrimination claim as set forth in their First Cause of Action and awarding them damages, including punitive damages, and attorney's fees;

(c)     Declaring that Defendants, by the acts and omissions described above, violated Plaintiffs' rights under the minimum wage provisions of the FLSA at 29 U.S.C. § 206(a) as set forth in Plaintiffs' Second Cause of Action;

(d)     Granting judgment in favor of Plaintiffs on their FLSA minimum wage claim as set forth in their Second Cause of Action and awarding them their unpaid minimum wages, an equal amount in liquidated damages, costs of court, and attorney's fees;

(e)     Granting judgment in favor of Plaintiffs on their contract claim as set forth in their Third Cause of Action and awarding them their damages for Defendants' contractual breaches;

(f)     Declaring that Defendant Mike Coleman, by the acts and omissions of Defendant Kim Coleman, described above, violated the Kentucky Civil Rights Act by discriminating against Plaintiffs based on their race and national origin as set forth in Plaintiffs' Fourth Cause of Action;

(g)     Granting judgment in favor of Plaintiffs on their claim of discrimination claim under K.R.S. § 344.450 as set forth in their Fourth Cause of Action and awarding them damages,

including attorney's fees;

(h)     Granting judgment in favor of Plaintiff Francisco Avila Bernal on his claim of

outrageous conduct committed by Defendant Kim Coleman as set forth in Plaintiff Francisco's

Fifth Cause of Action;

(i)     Declaring that Defendants, by the acts and omissions described above, violated

Plaintiffs' rights under the forced labor provision of the TVPA at 18 U.S.C. § 1589 as set forth in

Plaintiffs' Sixth Cause of Action;

(j)     Granting judgment in favor of Plaintiffs on their TVPA forced labor claim as set

forth in their Sixth Cause of Action and awarding them damages, including punitive damages,

and attorney's fees;

(k)     Awarding Plaintiffs pre- and post-judgment interest, as allowed by law;

(l)     Awarding Plaintiffs their costs; and

(m)     Granting such other relief as this Court deems just and appropriate.

Respectfully submitted,

**/s/ Laura E. Landenwich**
Laura E. Landenwich
Adams Landenwich Walton PLLC
517 W. Ormsby Ave.
Louisville, KY 40203
Telephone: (502) 561-0085
Facsimile: (502) 415-7505
Laura@justiceky.com


**/s/ Melia Amal Bouhabib**
Melia Amal Bouhabib
*Pro Hac Vice Motion Forthcoming*
SOUTHERN MIGRANT LEGAL SERVICES
A Project of Texas RioGrande Legal Aid, Inc.
311 Plus Park Blvd., Ste. 135
Nashville, TN 37217
Telephone: (615) 538-0725

Facsimile: (615) 366-3349
abouhabib@trla.org


ATTORNEYS FOR PLAINTIFFS